734 So.2d 63 (1999)
Nelda Branch FORAKER, et vir., Plaintiffs-Appellants,
v.
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY, AGRICULTURAL AND MECHANICAL COLLEGE, Defendant-Appellee.
No. 31,740-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1999.
Writ Denied June 18, 1999.
*64 Nelson, Hammons & Self by John L. Hammons, Shreveport, Counsel for Plaintiffs-Appellants.
The Townsley Law Firm by Todd Townsley, Lake Charles, Weems, Schimpf, Hayter, Gilsoul & Carmouche by John O. Hayter, III, Shreveport, Jerald L. Perlman, Shreveport, Counsel for Defendant-Appellee.
Before BROWN, STEWART and DREW, JJ.
DREW, J.
Nelda Foraker ("Nelda") suffered severe burns as a child in 1959 and was hospitalized at Confederate Memorial Hospital (now known as the LSU Medical Center) in Shreveport. Nelda alleges that she received a blood transfusion while at Confederate Memorial. Nelda and her husband, Tommy Foraker, filed suit in September 1994 alleging that Nelda contracted Hepatitis C from a 1959 blood transfusion during her stay at Confederate Memorial. Following a three-day trial in April 1998, the trial court rendered judgment dismissing the Forakers' demands. The court ruled that their claims had prescribed, and in the alternative, found in favor of defendant on the merits.
We affirm the judgment.

FACTS
In the Spring of 1959, eight year-old Nelda was playing near an uncle who was burning a handle out of an ax. Nelda was wearing her Easter dress, with a fluffy "can-can" slip under the dress. At some point, the slip ignited, burning Nelda from her mid-back down to both her legs. Nelda described the burns as so severe that she was able to see the bones in her left hip joint. Nelda was first taken to a DeRidder hospital, then transported to Confederate for treatment of her burns.
Nelda testified that she underwent seven skin graft operations and numerous debridements. She remembered once awakening after surgery and seeing that she was receiving blood. According to Melba Branch, Nelda's mother, Nelda was in the hospital from March to May. According to the certification of hospital records attached to the LSU Medical Center records filed into evidence, the records of Nelda's 1959 hospitalization, which would have corroborated or contradicted Nelda's allegation related to a blood transfusion, were microfilmed in 1970, then the microfilms were destroyed in 1991 due to the *65 age, foul odor and unreadable condition of the films.
Expert witnesses testified that the Hepatitis C virus can be transmitted several ways, such as through IV drug use, needle stick (percutaneous) injuries, blood transfusions and intranasal cocaine use. It can also be transferred within a family by the sharing of toothbrushes, razors and nail clippers. We note that Paula Anderson, Nelda's sister, has been diagnosed with Hepatitis C to which she was exposed when she received a transfusion in 1975. In a large percentage of Hepatitis C patients, estimated by some experts to be 30%, the cause of the disease is never known. Because no test exists to determine precisely how a patient contracted the illness, doctors depend on a patient's veracity in order to determine the risk factors to which the patient may have been exposed. It is possible for the disease to remain asymptomatic for decades after the virus enters the body. Nelda's Hepatitis C has progressed to the point that she has now developed cirrhosis of the liver and is awaiting a liver transplant.
The Forakers' original petition, filed against the Board of Supervisors of Louisiana State University ("LSUMC") on September 19, 1994, alleged that Nelda contracted Hepatitis C when she received a blood transfusion at Confederate in 1959. The petition further alleged that Nelda was treated by Dr. Hooper Nichols in March or April of 1992, that diagnostic studies performed by Dr. Nichols revealed Nelda had Hepatitis C, and that Dr. Nichols advised Nelda shortly after his diagnosis that the probable means of her contracting the Hepatitis C was through a blood transfusion.
LSUMC filed an answer on March 28, 1996, asserting a general denial and that the Forakers' claim had prescribed. LSUMC filed the peremptory exception of prescription on October 10, 1997.
On November 5, 1997, more than three years after filing the original petition, the Forakers filed a supplemental and amending petition. The petition was amended to allege that Dr. Nichols did not discuss possible causes of Hepatitis C with Nelda when he diagnosed the disease. The petition was supplemented to allege that Nelda was unaware of her possible cause of action until shortly before filing the original petition, that Nelda learned of the causal relationship between blood transfusions and Hepatitis C from Paula Anderson, Nelda's sister, and that Nelda's physicians actively concealed the causal relationship by failing and refusing to advise Nelda that her Hepatitis C was caused by the 1959 transfusion.
The trial court rendered judgment on November 24, 1997, denying the exception of prescription. On December 8, 1997, LSUMC filed a motion for new trial on the exception of prescription. The trial court granted the motion for new trial on the exception of prescription and referred the exception to the trial on the merits.
Trial on the merits was held on April 21, 23 and 24, 1998, and the trial court rendered judgment on May 14, 1998. The trial court sustained the exception of prescription, and in the alternative, the court granted judgment on the merits in favor of LSUMC. The trial court's findings of fact include that: (i) the preponderance of the documentary and circumstantial evidence do not support the conclusion that Nelda received a blood transfusion while hospitalized at Confederate in 1959; (ii) when Nelda was advised of the Hepatitis C diagnosis, her treating physician informed her that a blood transfusion is one of the many known risk factors for contracting Hepatitis C; and (iii) during the same time period, Nelda's sister was diagnosed with Hepatitis C and was told that a blood transfusion is one of several known risk factors for contracting the disease. The trial court concluded that how Nelda contracted Hepatitis C was not established by the preponderance of the evidence presented on this record. The trial court further concluded that the Forakers' *66 claims were filed more than one year after they learned that Nelda had contracted Hepatitis C and more than one year after they learned that a blood transfusion is one of several known risk factors associated with contracting Hepatitis C.
The Forakers appeal, specifying three errors: (1) The trial court erred by disregarding uncontroverted testimony from Nelda and her mother that Nelda received one or more blood transfusions while hospitalized at Confederate Memorial; (2) the trial court erred by concluding that the 1959 blood transfusion did not cause Nelda's Hepatitis C; and (3) the trial court erred in concluding that the cause of action had prescribed.

PRESCRIPTION
La. C.C. art. 3492 provides that the one-year liberative prescription period for delictual actions begins to run from the date the injury or damage is sustained. When a petition reveals on its face that prescription has run, the plaintiff bears the burden of showing why his action has not prescribed. Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206; Harrison v. Gore, 27,254 (La.App.2d Cir.8/23/95), 660 So.2d 563, writ denied, 95-2347 (La.12/8/95), 664 So.2d 426. Nelda allegedly received the transfusion in 1959, but the Forakers did not file their petition until 1994. Thus, their suit is prescribed on the face of the petition. See Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La. App.2d Cir.5/10/95), 656 So.2d 683, writ not considered, 95-2387 (La.12/8/95), 664 So.2d 417, where the petition revealed on its face that prescription had run when the plaintiff filed suit in 1993 after he was diagnosed with cancer several years after being exposed to toxic chemicals in 1987.
The doctrine of contra non valentem agere nulla currit praescriptio acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Under the fourth category, contra non valentem is applied when a cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant. Wimberly v. Gatch, supra at 211. This fourth category is commonly known as the discovery rule, providing that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Id. at 211. The plaintiffs ignorance of the facts upon which his cause of action is based cannot be willful, negligent or unreasonable. Burdeaux v. Cline, 626 So.2d 1205 (La.App. 2d Cir.1993), writ denied, 93-3132 (La.2/11/94), 634 So.2d 833.
The liberative prescription of one year does not begin to run until the victim knows or should know of the damage, the delict and the relationship between them. Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211. An injured party does not need actual knowledge of his condition for purposes of starting the statute of limitations for delictual actions, so long as there is "constructive notice," that is, information sufficient to incite curiosity, excite attention or put a reasonable person on guard to call for inquiry. Boyd v. B.B.C. Brown Boveri, Inc., supra.
Dr. Nichols told Nelda that she had Hepatitis C in April 1992. The original petition stated that "shortly after" diagnosing the Hepatitis C, Dr. Nichols told Nelda and her family that she probably contracted the disease through a blood transfusion. After LSUMC filed an exception of prescription and more than three years after filing their original petition, the Forakers amended their petition. They now alleged that Nelda learned of the causal connection from Paula Anderson, her sister. Citing Dr. Nichols' April 23, 1996 deposition, appellants now alleged that Dr. Nichols did not discuss possible causes of the Hepatitis C with Nelda. According to Nelda, Dr. Nichols did not mention anything about the possibility of the *67 blood transfusion as a cause until he told her family while she was in a coma around Passover of 1997.
Dr. Nichols, who is a gastroenterologist, performed a liver biopsy in March 1992, which demonstrated chronic persistent Hepatitis. Dr. Nichols testified that Nelda also had a positive anti-hepatitis C antibody test. Nelda came to his office on April 13, 1992 to discuss the liver biopsy report. Dr. Nichols testified in his deposition that it was "possible" that at this time he told Nelda about a connection between the Hepatitis C and her blood transfusion. However, Dr. Nichols could not recall any specific conversation about causation. Nevertheless, Dr. Nichols failed to testify that he did not discuss the blood transfusion as a possible cause at this time.
We highlight Nelda's testimony about what occurred when she met with Dr. Nichols in April 1992. Nelda testified that when Dr. Nichols diagnosed her with Hepatitis C, she and her husband both asked Dr. Nichols how she became infected, to which Dr. Nichols responded that he did not know. Nelda also remembered that Dr. Nichols asked her if she used IV drugs. Nelda wanted Dr. Nichols to pinpoint if her disease was communicable. Without a doubt, the etiology of Nelda's Hepatitis C was discussed at this time. Dr. Nichols' partner, Dr. Ross, had already documented in Nelda's records that she had received a blood transfusion. Thus, it is reasonable to believe that Dr. Nichols, while discussing etiology on this date, would discuss with Nelda the possibility that the blood transfusion was the source of her Hepatitis C.
When questioned at trial about how and when she learned that Hepatitis C can be transmitted by a blood transfusion, Nelda testified that she learned this information from Dr. Galati in Houston. However, Nelda then reported that her sister was the first to tell her the disease can be caused by a blood transfusion. Nelda remembered that Paula Anderson called to tell her that Anderson's Hepatitis C was caused by a blood transfusion and that Nelda had a reason to check into the transfusion connection and seek legal counsel. Nelda insisted that about a week after learning of this information from her sister, she sought legal counsel from Todd Townsely, who is one of her relatives. Nelda stated that she and her husband filed suit no longer than a month or two after her sister informed her of the blood connection. `Thus, according to Nelda, she learned of the causation from Paula Anderson sometime in late summer of 1994.
Paula Anderson was diagnosed with Hepatitis C after Nelda. Anderson's deposition testimony directly contradicts Nelda's trial testimony in two ways. Anderson stated that when she was diagnosed with Hepatitis C in September 1993, she called Nelda to tell her and Nelda asked if she had received any blood. First, Anderson is contradicting Nelda's testimony that she learned of the possibility of blood transfusion as a Hepatitis cause from Anderson. Second, Nelda testified that she learned of the connection from her sister a month or two before she filed suit in September 1994. However, Anderson stated that she conversed with Nelda about the blood connection after she was diagnosed in September 1993, a year before the Forakers filed suit.
Dr. William Ross was Dr. Nichols' partner until Dr. Ross moved to Houston in March 1992. Dr. Ross first saw Nelda on October 24, 1991. He felt that Nelda had chronic Hepatitis at the time. He told her she had Hepatitis, but he did not know exactly which type. Dr. Ross testified that he went over Nelda's history in great detail during this first visit in order to determine an etiology for her Hepatitis. Nelda reported to Dr. William Ross that she had had a blood transfusion. Dr. Ross discussed with Nelda the blood transfusion as a possible cause. Dr. Ross obviously did not fail or refuse to advise Nelda that her Hepatitis C may have been caused by the 1959 transfusion. Therefore, it is clear *68 that as early as October 1991, Nelda knew that she had some form of Hepatitis and that it could have been caused by the blood transfusion. No scientific test exists which can pinpoint exactly what risk factor to which a patient was exposed that caused the Hepatitis C.
Nelda, who is an ordained minister, can be accurately described as an intelligent woman. She graduated from Delta Business School with a 4.0 grade point average, which placed her on the President's List. She is also a published poet. The Forakers are not strangers to the civil court system. Nelda filed suit in April 1992 regarding an incident involving a pothole. Todd Townsley, Nelda's distant cousin, has enrolled as co-counsel of record for the Forakers in the case before us. Rex Townsely represented Tommy Foraker in two suits he filed on March 17, 1992, one against Nissan Motor Corporation, and the other suit against Gravity Drainage District and City of Westlake. It was not reasonable for Nelda to delay filing suit until more than two years after she learned of her diagnosis.
By the time Nelda learned that she had Hepatitis C in April 1992, Nelda was aware that the Hepatitis C was possibly caused by the transfusion she insisted she received in 1959. At this point, Nelda was cognizant of the damage, delict and the relationship between them. Liberative prescription of one year began running at this point, thus, the cause of action had prescribed by the time the original petition was filed in September 1994.
Because we agree with the trial court that the cause of action has prescribed, there is no need for this court to address the additional assignments of error regarding whether Nelda received the transfusion and whether the alleged transfusion caused the Hepatitis C.

MOTION TO SUPPLEMENT
On March 16, 1999, appellants filed with this court a motion to supplement the record with an affidavit from Dr. William Haynie and photographs of Nelda's scars. Dr. Haynie stated that he was a resident in pediatrics at Confederate Memorial beginning in July 1959, and while he does not remember treating Nelda, it is likely he would have been involved in her care. Dr. Haynie further stated that if Nelda suffered severe burns, then there would be a 90% to 95% chance that she received a blood transfusion. Because this evidence relates to the issue of whether Nelda received a blood transfusion, but not to the issue of prescription, it is likewise unnecessary for this court to consider the motion to supplement.

DECREE
At appellants' cost, the judgment is AFFIRMED.