11 DREW, J.:
In this suit to recover damages sustained as the result of her late husband R.D. Hughes’ occupational exposure to asbestos, Letha Hughes appeals a judgment granting Olin Corporation’s exception of prescription and dismissing this action as to that defendant. We reverse.

FACTS

Mr. Hughes was diagnosed with asbestosis in 1990. In 2000, he began experiencing shortness of breath. A physician in April 2000 believed Mr. Hughes had meso-thelioma after a pathologist examined Mr. Hughes’ pleural fluid and found it to be suspicious for epithelioid malignant neoplasm. Mr. Hughes underwent a thora-coscopy later that month, and the postoperative diagnosis was probable malignancy, mesothelioma or adenocarcinoma. An examination of the biopsied lung matter, pleura and pleural fluid revealed ade-nocarcinoma. The biopsied materials were subsequently examined by a different pathologist the next month, and the diagnosis was malignant epithelial mesothelioma. This diagnosis was conveyed to Mr. Hughes on June 9, 2000.
Mr. and Mrs. Hughes filed suit on May 4, 2001, against numerous corporate defendants including Olin Corporation (“Olin”). The Hugheses complained that due to Mr. Hughes’ occupational exposure to asbestos and asbestos-containing products, he sustained both physical and mental injuries, including but not limited to mesothelioma. Mr. Hughes died on June 8, 2002, at the age of 81.
In its exception of prescription filed on August 20, 2002, Olin contended that prescription commenced no later than April 27, 2000, which 1;>was the date of the thora-coscopy that showed that Mr. Hughes had cancer. On November 8, 2002, the trial court granted Olin’s exception. Mrs. Hughes appeals.

DISCUSSION

The party raising the exception of prescription ordinarily bears the burden of proof at the trial of the peremptory exception. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992). However, when it is clear on the face of a plaintiffs petition that prescription has run, the plaintiff bears the burden of showing why the claim has not prescribed. Lima v. Schmidt, 595 So.2d 624 (La.1992).
Delictual actions are subject to a liberative prescription of one year, which commences to run from the date the injury or damage is sustained. La. C.C. art. 3492. Damage is considered to have been sustained, within the meaning of art. 3492, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. Cole v. Celotex Corp., 620 So.2d 1154 (La.1993).
In order to soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non va-lentem non currit praescriptio, which means that prescription does not ran against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992). This court explained in Foraker v. Board of Sup’rs of Louisiana State University, Agr. and Mechanical College, 31,740 (La.App.2d Cir.4/1/99), 734 So.2d 63, writ denied, 99-1268 (La.6/18/99), 745 So.2d 607:
*225 1¡¡The doctrine of contra non valentem agere nulla currit praescriptio acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Under the fourth category, contra non valentem is applied when a cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant. This fourth category is commonly known as the discovery rule, providing that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. The plaintiffs ignorance of the facts upon which his cause of action is based cannot be willful, negligent or unreasonable.
Id., 734 So.2d at 66. Citations omitted.
Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502. Constructive knowledge sufficient to commence the running of prescription requires more than a mere apprehension that something might be wrong. Cordova v. Hartford Acc. & Indem. Co., 387 So.2d 574 (La.1980). An injured party has constructive notice of his condition when he possesses information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry. Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La.App.2d Cir.5/10/95), 656 So.2d 683. As stated by our supreme court:
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
When prescription begins to run depends on the reasonableness of a plaintiffs action or inaction....
\ Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987).
Radiologist Dr. Richard Levine took four projections of Mr. Hughes’ chest in July of 1990. No mass was observed in the lungs. He found interstitial fibrosis at the lung bases that was typical of previous asbestos exposure and indicated asbestosis. Mr. Hughes testified that he understood this to mean that he had asbestos in his lungs.
After receiving the asbestosis diagnosis, Mr. Hughes became a plaintiff in three class-action suits alleging exposure to asbestos: James Adams, et al v. Adience Company, et al, filed on August 9, 1990, in Dade County, Florida; Wesley G. Abels, et al v. A.P. Green Refractories Co., et al, filed on January 29, 1991, in Dade County, Florida; and James C. Adams, Jr., et al v. Aireo Welding Products, et al, filed on June 28, 1991, in Orleans Parish. In his settlements in these actions, Mr. Hughes reserved a comeback right in the event that he was later diagnosed with mesothe-lioma. The settlements did not encompass any future claim for mesothelioma.
Mr. Hughes was examined by pulmonol-ogist Dr. Robert Sarama on April 13, 2000. Mr. Hughes complained of having had progressive shortness of breath for a few weeks, and he reported having smoked from the age of 15 to the age of 59. A previous chest x-ray had shown a right pleural effusion. Dr. Sarama’s impression was a pleural effusion which did not appear on physical examination nor by history to be related to congestive heart failure. *226 A thoracentesis was performed on that date. A subsequent chest radiograph showed a minimal residual right pleural effusion.
|ROn April 14, 2000, pathologist Dr. Howard Wright examined the pleural fluid removed during the thoracentesis. He found the fluid to be suspicious for epithelioid malignant neoplasm. His report noted that mesothelioma and large cell carcinoma should be considered in the differential diagnosis.
Dr. Sarama’s notes from April 18, 2000, state that the cytology of the pleural effusion was suspicious for an epithelioid malignant neoplasm, either mesothelioma or large cell carcinoma. Dr. Sarama thought that Mr. Hughes needed to undergo a thoracoscopy to determine if he had meso-thelioma, which Dr. Sarama strongly suspected due to Mr. Hughes’ history of smoking and asbestos exposure. An April 19, 2000, x-ray of Mr. Hughes’ chest revealed a moderate right-sided pleural effusion, etiology indeterminate.
Mr. Hughes presented to surgeon Dr. John Lipka on April 24, 2000, with complaints of shortness of breath for two weeks. Dr. Lipka learned from Mr. Hughes that he had a right-sided pleural effusion that was suspicious for malignancy, that he had not used tobacco for 18 years, and that he had a history of asbestos exposure from his employment as a construction worker, welder, and farmer. Dr. Lipka testified in his deposition that knowing that a patient had been exposed to asbestos is important when a patient has a bloody pleural effusion and had not smoked tobacco in almost 20 years because mesothelioma is associated with asbestos exposure and not tobacco use.
| (¡Biopsies of Mb. Hughes’ pleura, pleural fluid, and the right upper lobe of his lung were taken during a thoracoscopy performed at Morehouse General Hospital on April 27, 2000. The diagnosis in the post-operative report was that there was a probable malignancy, “mesothelioma vs. adenocarcinoma.” Examination of the pleura tissue on April 28, 2000, by pathologist Dr. Kenneth Harrison revealed “malignant neoplasm consistent with metastatic mucin-producing adenocarcinoma.” Examination of the lung tissue by Dr. Harrison revealed “metastatic mucin-pro-ducing adenocarcinoma noted on the visceral pleural surface.” Pathologist Dr. R. Bruce Williams analyzed the pleural fluid on May 1, 2000, and found it to be “positive for malignant cells, most consistent with adenocarcinoma.” The biopsied tissues were then sent to the M.D. Anderson Cancer Center for further evaluation. Dr. Nelson Ordonez’s May 22, 2000, surgical pathology report stated that the pleura biopsy and the right upper lobe biopsy both showed malignant epithelial mesothe-lioma.
Dr. Lipka next saw Mr. Hughes on May 19 and May 25. During the May 25 visit, he talked to Mr. Hughes about his treatment options because at the time there was a question about whether Mr. Hughes’ disease was adenocarcinoma or mesothelio-ma. Dr. Lipka called Mr. Hughes back on June 9 and communicated to him the diagnosis of mesothelioma along with the news that there were no treatment options.
Olin argues on appeal that Mr. Hughes acted unreasonably in delaying the filing of his lawsuit for more than one year after he was told that he probably had lung cancer and that it was suspicious for 17mesothelioma. It is contended that Mr. Hughes had sufficient knowledge of his cause of action when Dr. Sarama first suspected that Mr. Hughes had mesothelioma. However, such a contention misses the point that at the time Mr. Hughes was first told that he probably had lung cancer *227 that was suspected to be mesothelioma, he still did not definitely know whether he had lung cancer, and, if so, whether it was lung cancer associated with asbestos exposure (mesothelioma) or lung cancer of a different etiology such as smoking. He did not have constructive, much less actual, knowledge of his cause of action at that time.
Olin also argues that prescription commenced no later than April 27, 2000, the date the lung mass was diagnosed as cancerous.[1] However, it should be noted that the post-operative note from the April 27 thoracoscopy stated that there was a “probable” malignancy. Moreover, the pathologists who first examined the biopsied materials opined that his disease was ade-nocarcinoma, which is apparently a cancer unrelated to asbestos exposure.
Dr. Lipka, who regarded himself as the closest thing to a primary treating physician for Mr. Hughes, was certain that he talked to Mr. Hughes on April 24 about the relevance of asbestos exposure to some of the diseases that he could have, such as the association between asbestos and mesothelioma. He told Mr. Hughes on that date that he could have adenocarci-noma, mesothelioma, or something benign. Dr. Lipka recalled that Mr. Hughes did not come to him with any preconceived notion that he | shad a certain disease. Dr. Lipka was sure that in order to prepare Mr. Hughes for an unfortunate diagnosis, he told Mr. Hughes about a differential diagnosis and how he could have something benign but because of the bloody effusion that he almost certainly had a malignant disease. The differential diagnosis that he first discussed with Mr. Hughes would have been benign versus malignant, then adenocarcinoma versus mesothelioma or other type of non-small-cell lung cancer.
Dr. Lipka stated that at the time of Mr. Hughes’ May 25 visit, there was no definite pathological diagnosis of his condition. It was not until June 9 that he could tell Mr. Hughes that he had a disease known to be associated with asbestos exposure. All Dr. Lipka did up until that time was to discuss what the possibilities were, which went from benign or malignant, to knowing it was malignant, to having a specific diagnosis of mesothelioma.
Dr. Lipka explained that a diagnosis of adenocarcinoma would not trigger in his mind that a person has a cancer related to asbestos exposure because adenocarcinoma is not pathognomonic for asbestos exposure; by contrast, mesothelioma is pathog-nomonic for asbestos exposure. If Mr. Hughes had had adenocarcinoma, then Dr. Lipka testified that he probably would have told Mr. Hughes that it was related to his smoking.
Dr. Lipka stated that it is well-documented that mesothelioma is associated with asbestos exposure. However, Dr. Lipka described mesothelioma as a “pretty rare” disease. Mr. Hughes was the first patient that Dr. Lipka had seen in several years who came in with a pleural effusion 1fland who actually had mesothelioma. Dr. Lipka added that mesothelioma tends to be a difficult diagnosis to make, and that pathologists often hedge on diagnosing questionable mesothelioma cases until they get a certain indicator. He also explained that when a pathologist thinks something is questionable, they will often send the sample to be examined by an expert pathologist. Pathologists originally pronounced the specimens as adenocarcinoma before they were sent to M.D. Anderson *228 Cancer Center where the mesothelioma was diagnosed.
Dr. Lipka also testified that mesothelio-ma cannot be diagnosed just by looking at it. A pathologist needs to examine it. Mr. Hughes was not diagnosed with lung cancer until April 28, and the diagnosis at that time was adenocarcinoma. Dr. Lipka opined that if a patient presented with Mr. Hughes’ symptoms and a previous diagnosis of asbestos, his suspicion would be pointed toward mesothelioma, but he would still take the normal diagnostic steps.
Dr. Lipka remarked that there was a question from a histologic standpoint about whether Mr. Hughes had mesothelioma even with the symptoms presented by Mr. Hughes in April and May, but the disease’s later progression established that the diagnosis of mesothelioma was correct. A review of Mr. Hughes’ medical history in April and May of 2000 shows that the diagnosis for Mr. Hughes went from probable cancer that was strongly suspected to be mesothelioma, to adenocarcinoma, to a final diagnosis of mesothelioma. Most interestingly, we note that Olin states in footnote 1 in its brief before this court that it even disputes the “alleged |indiagnosis of mesothelioma.” Under such circumstances, it was not unreasonable for Mr. Hughes to delay bringing suit until May 4, 2001, which was within one year from June 9, 2000, the date on which he learned that he had mesothelioma. Accordingly, the trial court was clearly wrong in granting Olin’s exception of prescription.
In support of the exception of prescription, Olin points to Mr. Hughes’ prior litigation history alleging asbestos exposure as evidence that he was aware of his risk of contracting mesothelioma. Among the allegations in the first Florida lawsuit were that:
Each Plaintiff was caused to contract diseases and injuries ... including ... mesothelioma, and other diseases and forms of cancer which have not yet been diagnosed, causing each Plaintiff pain, suffering and mental anguish.
[[Image here]]
Each Plaintiff has developed severe anxiety, hysteria or phobias, any or all of which have developed into a reasonable and traumatic fear of an increased risk of additional asbestos caused and/or related disease, including, but not limited to other forms of cancer not yet diagnosed to each Plaintiff, resulting from exposure, directly and indirectly, to the asbestos products of the said Defendants.
Similar allegations were made in the Orleans Parish lawsuit. It was additionally alleged in the Orleans Parish action that:
Each plaintiff also suffers from an increased risk of development of additional asbestos caused and/or related diseases, including, but not limited to other forms of cancer not yet diagnosed, resulting from exposure, directly and indirectly, to the asbestos and/or asbestos containing products of the said Defendants.
It is evident from these lawsuits that Mr. Hughes was aware of the possibility that he could develop mesothelioma as a result of his exposure to Inasbestos. Nevertheless, he could not bring suit to recover damages for contracting mesothelioma until he became aware that he actually had the disease. As noted above, that did not happen until June 9, 2000.
Finally, in support of prescription, Olin emphasizes this court’s decisions in Sumerall v. St. Paul Fire & Marine Ins. Co., 366 So.2d 213 (La.App. 2d Cir.1978); and Boyd v. B.B.C. Brown Boveri, Inc., 26,889 *229 (La.App.2d Cir.5/10/95), 656 So.2d 688. In Sumerall, it was alleged that a six-month-old boy suffered permanent brain damage as the result of the failure of a physician to diagnose his meningitis. His parents brought suit within one year of learning in June 1975 that their son had permanent brain damage despite earlier learning in January 1975 that their son was showing signs of neurological impairment and that the brain damage could possibly be permanent. Their child was hospitalized for treatment of hydrocephalus secondary to meningitis and continued to receive treatment for seizure control in the spring of 1975. Concluding that prescription began running prior to the diagnosis of permanent brain damage, this court upheld the trial court’s granting of the exception of prescription.
Sumerall can be distinguished from this case. The plaintiffs in Sumerall knew as early as January 1995 that their son had brain damage allegedly as a result of the misdiagnosis, although they did not know the degree of it until six months later. In contrast, Mr. Hughes did not receive a definitive diagnosis of mesothelioma, a disease related to asbestos exposure, until June 9, 2000.
11 Jn Boyd v. Boveri, supra, Boyd filed suit in March 1988 alleging that he suffered injury when exposed to toxic chemicals while fighting a fire. Boyd was ordered by the trial court to provide medical proof of his exposure to toxic chemicals and of the injuries he sustained. Boyd filed a motion to dismiss his suit in January 1990, and his claim was dismissed with prejudice. In July 1991, Boyd was diagnosed with cancer. Boyd was told by his attorney that he needed a medical expert who could substantiate the connection between the toxic exposure and his cancer. After learning from a physician in December 1992 that his illness and his toxic exposure were connected, Boyd filed suit on April 22, 1993, making essentially the same allegations against essentially the same defendants as in the prior suit. The trial court sustained the exception of prescription, and this court affirmed, finding that Boyd had constructive knowledge of his cause of action no later than when he was diagnosed with cancer in July of 1991.
Boyd can also be distinguished from the facts of this case. Boyd delayed bringing his second suit until he received medical confirmation that there was a connection between his cancer and the toxic exposure. In contrast, Mr. Hughes brought his suit within one year of his learning that he had a lung cancer related to asbestos exposure, as opposed to a cancer that could be traced to his lengthy, prior smoking history or was otherwise not related to asbestos exposure.
I ^CONCLUSION
For the foregoing reasons, we reverse the judgment granting Olin’s exception of prescription. This case is remanded to the trial court for further proceedings in accordance with this opinion.

DECREE

At appellee’s cost, the judgment is REVERSED and this case is REMANDED.

. We note that Dr. Harrison’s report states, in apparent reference to the specimen and subsequent examination, that it was received on April 27 and completed on April 28.