MOORE, J.
| TLaurie Watson appeals a judgment that sustained exceptions of prescription and dismissed her medical malpractice claim. The issue is whether she filed her request for a medical review panel (“MRP”) within one year from the date of discovery of the alleged act, omission or neglect, as required by La. R.S. 9:5628 A. Discerning no manifest error, we affirm.

Factual Background

Ms. Watson is a physical education coach at West Monroe High School. Her mother died young of breast cancer, when Ms. Watson was only 10 years old, so at *819 age 40 Ms. Watson began having annual breast screening exams.
In March 2009, she went for her screen at The Woman’s Clinic of Monroe. She reported to the nurse practitioner, Sherry Peveto, that she noticed a “puckering” on the inside part of her right nipple about two weeks prior. She had a screening mammogram at Glenwood Medical Mall on April 7; the radiologist, Dr. James Atchi-son, found a “small but subtle” lesion, so he ordered a spot compression mammogram. This was done on April 16, and Dr. Atchison interpreted it to show “benign findings.” Ms. Watson testified that Dr. Atchison told her she was cancer-free.
A few weeks later, she discovered a small knot on her right breast. She called The Woman’s Clinic on May 11, 2009, and went for a visit on May 22, reporting the knot to Nurse Peveto. She testified that at this time, she was “convinced” she had breast cancer. However, Nurse Peveto palpated the pea-sized nodule, found it “superficial,” and told Ms. Watson it was just a benign fibroid cyst caused' by drinking too much Dr. Pepper. She |2advised Ms. Watson to return “if anything changed.” Ms. Watson testified she was “elated” that she was cancer-free.
Ms. Watson came for her next screening on April 27, 2010, telling Nurse Peveto that she still had the inversion and knot but they had not changed in the last year. She had her screening' mammogram on May 6. A different radiologist, Dr. Hollen-berg, found an area of “increased density” that had appeared since the previous exam, and ordered an ultrasound. This test, taken on May 10, found a mass with irregular borders, which Dr. Hollenberg felt was “highly suspicious for malignancy,” so he ordered a needle biopsy. An internal record from The Woman’s Clinic states that the patient was informed of this and referred to a surgeon, Dr. Trey Zizzi; however, Ms. Watson testified that she was not given any test results until she saw Dr. Zizzi, on May 13. At any rate, Ms.'Watson had the needle biopsy at Glen-wood Medical Mall on May 12. This showed “infiltrating duct cell carcinoma, moderately differentiated.”
Ms. Watson testified that on her first visit to Dr. Zizzi, on May 13, 2010, he told her she had infiltrating ductal carcinoma in her right breast, and this was the first time anybody told her she had cancer. Dr. Zizzi did not remember many specifics of their conversation, but he was certain he advised her that the cancer was not a benign cyst, but cancer; that it had spread into surrounding breast tissue; and that treatment may require the removal of lymph nodes. Dr. Zizzi also testified that he referred Ms. Watson to a surgeon, Dr. Scott Barron, to discuss treatment options. Ms. Watson testified by deposition that at this time, she “most definitely” felt |sThe Woman’s Clinic had missed her diagnosis and she was “horrified” that the cancer had progressed for a year without treatment.
Ms. Watson went to Dr. Barron on May 19, 2010; he advised her that the cancer might have spread to tissue beyond the lump. She testified that she considered a lumpectomy, but decided she “didn’t want any more tests” and instead returned to Dr. Zizzi for a right mastectomy as a preventive measure against any future recurrence. She scheduled this for June 14 at Glenwood Regional Medical Center. However, a preoperative MRI of her chest, taken on June 1, showed not only the lump in her right breast, but suspicious nodes in the right axilla and “high risk of mastopa-thy in the left breast.” Informed of this, she elected a double mastectomy.
Dr. Zizzi performed the seven-hour surgery on June 14, 2010. Pathology of the excised tissue confirmed cancer in the left *820 breast and lymph nodes, as suspected from the MRI, and infiltrating lobular carcinoma of the right breast, Stage III(C). Ms. Watson testified that Dr. Zizzi gave her these results the following day, June 15. She felt this was a different form and stage of cancer than originally diagnosed, a “totally different ballgame,” and “like a death sentence.”

Action in the District Court

On June 14, 2011, Ms. Watson filed the instant request for MRP, naming as defendants Nurse Peveto, Dr. Tonya Sheppard, The Woman’s Clinic of Monroe, Glenwood Regional Medical Center and Dr. James Atchison. She alleged that they breached the standard of care by delaying her diagnosis, thereby allowing her cancer to spread, reducing her chances |4of survival, and causing her to undergo treatment that otherwise would not have been necessary.
The defendants filed three exceptions of prescription,[1] urging that Dr. Zizzi gave her the diagnosis of breast cancer on May 13, 2010, and that is the day she discovered the malpractice; the request for MRP, filed June 14, 2011, was more than a year later (32 days late).
At a hearing in February 2014, the defendants offered the Glenwood records, The Woman’s Clinic records, Dr. Zizzi’s records and deposition, a copy of the request for MRP, and Ms. Watson’s deposition. This evidence, they argued, showed that by May 13, 2010, when she got the diagnosis from Dr. Zizzi, Ms. Watson knew or should have known that the defendants misdiagnosed, or failed to diagnose, her breast cancer.
Counsel for Ms. Watson argued that there is a big difference between the May 13 pre-op diagnosis of infiltrating ductal carcinoma and the June 15 post-op diagnosis of infiltrating lobular carcinoma. “In order to prove loss of a chance of survival we have to know her actual diagnosis, her actual prognosis and go backwards” (emphasis added). Ms. Watson herself testified, stating that she had no medical or legal training; on May 13, Dr. Zizzi told her only that she had infiltrating ductal carcinoma, Stage I, of the right breast; she was horrified because it went a full year untreated and The Woman’s Clinic “must have missed it”; and nobody told her until after the double mastectomy, on June 14, that she had infiltrating lobular carcinoma or any disease at all in her left breast, whereupon “everything changed.” On | ¿cross-examination, she agreed that as of May 13, she knew she had cancer, not a benign fibroid cyst, and The Woman’s Clinic had missed the diagnosis in 2009.
The district court took the case under advisement and, in May 2014, delivered oral reasons for judgment. After giving the chronology of facts, the court cited Davidson v. Glenwood Resolution Auth., 47,640 (La.App. 2 Cir. 1/23/13), 108 So.3d 345, and the seminal case of Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502, for the rule that constructive knowledge is “whatever notice is enough to excite attention and to put the injured party on guard and call for inquiry.” Further, the “ultimate issue is the reasonableness of the patient’s action or inaction in light of his education, intelligence, severity of symptoms, and the nature of the defendant’s conduct.” The court then stated that the plaintiff need not “be informed of possible malpractice by an attorney or medical practitioner before prescription begins to run,” LaGrange v. Schumpert Med. Ctr., 33,541 (La.App. 2 Cir. 6/21/00), *821 765 So.2d 473. The court also discussed this court’s recent opinion in Morgan v. Patwardhan, 48,626 (La.App. 2 Cir. 3/12/14), 137 So.3d 680, writ denied, 2014-0919 (La.8/25/14), 147 So.3d 1118, concluding that the court is not bound to accept the date of discovery alleged by the plaintiff “at face value.” The court found that Ms. Watson did not specifically allege the date she discovered the malpractice, but the defendants’ direct evidence proved she had “constructive, if not actual knowledge, sufficient to begin the running of prescription on May 13, 2010, when she was told she had cancer.” The request for MRP was | ^therefore untimely under R.S. 9:5628 A. The court rendered judgment sustaining the exceptions and dismissing Ms. Watson’s claim.
Ms. Watson has appealed, raising four assignments of error.

Discussion: Lost Chance of Survival as Independent Cause of Action

Ms. Watson’s first assignment of error urges that the district court committed legal error in not recognizing the lost chance of survival as an independent cause of action under La. R.S. 9:5628. She shows that prescription statutes must be strictly construed against prescription and in favor of the claim, Bailey v. Khoury, 2004-0620 (La.1/20/05), 891 So.2d 1268. She concedes that she suspected a breach of the standard of care as early as May 13, but not until June 14 could she, or any doctor, have any basis for believing that such breach caused her actionable harm. She contends that her “actionable harm” was not cancer per se, but her “reduced life expectancy due to a delay in diagnosing it.” She argues that Morgan v. Patwardhan, on which the district court relied, is inapposite, as that plaintiff was not asserting a lost chance of survival or a delayed diagnosis. By reply brief, Ms. Watson asserts that one court has held the loss of a chance of survival to be a separate and distinct cause of action, not just an element of damages in a medical malpractice claim, Braud v. Woodland Village LLC, 2010-0137 (La.App. 4 Cir. 12/8/10), 54 So.3d 745, writ denied, 2011-0311 (La.4/1/11), 60 So.3d 1254.
In general, a cause of action is defined as “the state of facts which gives a party a right to judicially assert an action against the defendant.” Church Mut. Ins. Co. v. Dardar, 2013-2351 (La.5/7/14), 145 So.2d 271; Udomeh v. Joseph, 2011-2839 (La.10/26/12), 103 So.3d 343. We are not aware of any case holding explicitly that a lost chance of survival is a cause of action separate and distinct from the cause of action for injury or death arising from medical malpractice. The jurisprudence has treated the lost chance of survival as an element of damages arising from a malpractice claim, not as a separate cause or claim. In the seminal case of Smith v. State, 95-0038 (La.6/25/96), 676 So.2d 543, the supreme court recognized that loss of a chance of survival is “a distinct compensa-ble injury caused by the defendant’s negligence, to be distinguished from the loss of life in wrongful death cases,” id. at 547 (emphasis added). The court identified “three possible methods of valuation of the loss of a chance of survival in professional malpractice cases,” id. at 547, and cited with approval an A.L.R. annotation stating the majority view that “damages were recoverable for loss of chance as a separate element of damages, rather than as a general theory of recovery, in medical malpractice actions based on lost chance.”[2] Four years later, the supreme court stated that for the prescriptive period to eom- *822 menee, “the plaintiff must be able to state a cause of action — both a wrongful act and resultant damages.” Guitreau v. Kucharchuk, 99-2570 (La.5/16/00), p. 6, 763 So.2d 575, 580. Without explicitly so holding, this strongly indicates that the tort of, and the harm arising from, medical malpractice form one cause of action.
More specifically, in Coody v. Barraza, 47,732 (La.App. 2 Cir. 3/6/13), 111 So.3d 485, this court stated that the lost chance of survival and |sa wrongful death claim, arising from medical malpractice, are “theories of injury” for which “only- one kind of damages or the other can be awarded.” In Bolton v. Willis-Knighton Med. Ctr., 47,923 (La.App. 2 Cir. 4/24/13), 116 So.3d 76, writs denied, 2013-1307, 2013-1308 (La.9/20/13), 123 So.3d 176, this court described the claims of wrongful death and lost chance of survival as “two theories of injury [that] are distinct.” We added, “The lost chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survivor claim.” Id. at 11, 116 So.3d at 84. And in Davidson v. Glenwood Resolution Autk, supra, this court reiterated that the plaintiffs cause of action includes “both a wrongful act and resultánt damages.” Id. at 6, 108 So.3d at 350, quoting Guitreau v. Kucharchuk, supra.
In short, the focus is always on the value of the lost chance of survival as an element of the cause of action. Contrary to Ms. Watson’s position, Braud v. Woodland Village LLC, supra, is in accord with Smith, Guitreau and this court’s cases: “The loss of chance of survival is a distinct compensable injury caused by a defendant’s negligence, distinguishable from the loss of life in wrongful death cases.” Braud, supra at 7, 54 So.3d at 751. In short, the lost chance is a separate and valuable claim or element of damages, not a distinct cause of action that may accrue later than the initial act of malpractice.
Moreover, we have considered the practical effect of Ms. Watson’s argument. She had an evolving diagnosis of infiltrating ductal carcinoma of the right breast on May 13; a high risk of mastopathy in the left breast on 19June 1; and a final diagnosis of infiltrating lobular carcinoma on June 14. This court has rejected the argument that prescription does not start to run until the patient receives a definitive diagnosis. Morgan v. Patwardhan, supra, and Bailey v. Haynes, 37,038 (La.App. 2 Cir. 4/9/03), 843 So.2d 584, writ denied, 2003-1209 (La.10/10/03), 856 So.2d 1207. Although Ms. Watson’s situation is highly sympathetic, we are not inclined to recognize a new and separate cause of action where no court has ever recognized one before. This assignment of error lacks merit.

Standard of Review

Also by her first assignment of error, Ms. Watson urges that the district court’s legal error in failing to treat the lost chance of survival as an independent cause of action takes the case out of manifest error and into de novo review, Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. Of course, we have found that the district court did not apply an incorrect legal standard. Nothing in the court’s approach “interdicted” the factfinding process, which would be a requirement for de novo review. McGlothlin v. Christus St. Patrick Hosp., 2010-2775 (La.7/1/11), 65 So.2d 1218, and citations therein.
The proper standard of review is therefore manifest error, which means those findings will not be disturbed unless they are plainly wrong or manifestly erroneous. La. Const. Art. V, § 10; Wooley v. Lucksinger, 2009-0571 (La.4/1/11), 61 *823 So.3d 507. Under this standard, the trial court’s findings are entitled to great deference on review. McGlothlin v. Christus St. Patrick Hosp., supra. When there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or plainly wrong. Khammash v. Clark, 2013-1564 (La.5/7/14), 145 So.3d 246; Rosell v. ESCO, 549 So.2d 840 (La.1989).
The district court considered a large amount of documentary and expert evidence, and Ms. Watson’s testimony, to make a finding with respect to discovery of the alleged act, omission or neglect. There is no basis to apply de novo review to this inherently factual finding. This argument lacks merit.

Commencement of Prescription

By her second assignment of error, Ms. Watson urges the court erred in not considering her reasonableness in completing the medical work-up, surgery and investigation necessary to discover her cause of action within 32 days. She maintains she acted reasonably, diligently and without delay to discover her cause of action, and until June 14 she had no basis to believe she was damaged by a delay in diagnosing her cancer. By her third assignment, Ms. Watson urges the court erred in finding that prescription began before her cause of action was known or knowable to her, to her doctors or to anyone else. She urges that before prescription can begin to run, a plaintiff must have “sufficient information to be able to state a cause of action — both a wrongful act and resultant damages,” Guitreau v. Kucharchuk, supra.[3]
A claim for medical malpractice must be brought “within one year |1Tfrom the date of the alleged act, omission, or neglect, or within one year from the date of the discovery of the alleged act, omission, or neglect[.]” La. R.S. 9:5628 A. The statute embodies both the Civil Code’s general provision for a one-year prescriptive period of tort claims, La. C.C. art. 3492,- and the “discovery rule,” an important portion of the jurisprudential doctrine of contra non valentem. Campo v. Correa, supra.
Under the discovery rule, prescription begins “when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort.” Id. A prescriptive period begins to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit, as long as he has constructive knowledge of such facts. Constructive knowledge is “whatever notice-is enough to excite attention and put the injured person on guard and call for inquiry.” Id., and citations therein. The ultimate issue in determining constructive knowledge is the “reasonableness of the patient’s action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant’s conduct.” Id. (emphasis in original). In Bailey v. Khoury, supra, the supreme court elaborated:
The damage suffered must at least be actual and appreciable in quality — that is, determinable and not merely speculative. But there is no requirement that the quantum of damages be certain or that they be fully incurred, or’incurred *824 in some particular quantum, before the plaintiff has a right of action. Thus, in cases in which a plaintiff has suffered some but not all of his damages, prescription runs from the date on which he first suffered actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damages as a result of the completed tortious act.
Bailey v. Khoury, supra at 10, 891 So.2d at 1276, citing Harvey v. Dixie Graphics Inc., 593 So.2d 351, 354 (La.1992).
The record, as a whole, fully supports the district court’s finding that Ms. Watson had constructive notice of the missed diagnosis more than a year before she filed this action on June 14, 2011. The most direct evidence is her candid admission that when she saw Dr. Zizzi on May 13, 2010, she “most definitely” believed The Woman’s Clinic had missed the diagnosis and she was “horrified” that the cancer had progressed for a year without treatment. Dr. Zizzi agreed that on the May 13 visit he would have told her that the cancer was malignant and had spread into surrounding tissue. Ms. Watson also testified that on May 19, Dr. Barron told her the cancer had spread beyond the lump. The breast MRI on June 1 showed “high risk mastopathy,” and Ms. Watson admitted Dr. Zizzi informed her of this by June 4. Perhaps the most telling circumstantial evidence was Ms. Watson’s decision, prior to June 1, to forgo the lumpectomy in favor of a full, right mastectomy, and then, after receiving the MRI results, to undergo a double mastectomy. These facts fully support a finding of constructive notice, and perhaps even actual notice, before the date of surgery, June 14.
Both in the district court and on appeal, Ms. Watson has vigorously argued that prescription could not begin to run until she learned the precise type and stage of breast cancer, infiltrating lobular carcinoma, Stage III(C), after the June 14 surgery and pathology reports. She testified that this was a “totally different ballgame,” and felt it was reasonable to wait until the final diagnosis. However, the evidence outlined above was more than sufficient to show that she knew or should have known, by the middle of May 2010, [isthat The Woman’s Clinic had missed diagnosing her breast cancer in May 2009, and that the disease had spread. Ms. Watson’s initial impression on May 13, 2010, was reasonable, whether the disease was ultimately classified as ductal or lobular. Moreover, Dr. Zizzi testified that there, is little distinction between the two: both are malignant, infiltrating, will spread if untreated, and are treated in precisely the same manner by the surgeon. Aside from argument, there is no medical evidence in the record to contradict Dr. Zizzi’s testimony.
In short, the district court did not abuse its discretion in finding that Ms. Watson had constructive notice of the missed diagnosis over a year before she filed this malpractice claim. The events of May 13, 2010, were sufficient to place Ms. Watson on notice that she had suffered appreciable damage, even though she later learned the damage was more extensive than originally thought. Bailey v. Khoury, supra. The district court also did not abuse its discretion in finding on the “ultimate issue” that the delay of 32 days was not reasonable, in light of the gravity of the initial diagnosis. These assignments of error lack merit.

Manifest Error Argument

By her fourth assignment of error, Ms. Watson urges that even under the manifest error standard, she is entitled to reversal because the finding of prescription is clearly wrong. She argues that her situation is analogous to the plaintiffs in *825 Hughes v. Olin Corp., 37,404 (La.App. 2 Cir. 10/3/03), 856 So.2d 222, writ denied, 2003-3191 (La.2/20/04), 866 So.2d 828, a products liability case. She contends that in Hughes, this court held that an 114early diagnosis of asbestosis did not start to run prescription against the manufacturer; only the later, definitive diagnosis of meso-thelioma did.
The situation in Hughes is inapposite. Hughes was diagnosed with work-related asbestosis, joined three class-action lawsuits, and entered a settlement in which he reserved a comeback right in the event he was later diagnosed with mesothelioma. The settlements expressly excluded any claim for mesothelioma. In April 2000, Hughes had trouble breathing and went to a lung doctor; two tests showed probable malignancy, mesothelioma or adenocarci-noma, but the doctor could not say which. A pathology report showed that it was mesothelioma, but this diagnosis was not conveyed to Hughes until June 2000. Hughes filed suit on May 4, 2001, over a year after the differential diagnosis but within one year of the definitive diagnosis of mesothelioma. The manufacturer filed a peremptory exception urging that prescription began to run on the date of the differential diagnosis, and- the district court sustained it. This court reversed, stating broadly that Hughes had no cause of action until he had “a definitive diagnosis of mesothelioma.”
Obviously, Hughes was not a medical malpractice case, and its holding is framed by the class-action settlements that resolved all causes of action except for meso-thelioma. Hughes did not state, and the opinion should not be interpreted as saying, that prescription in a medical malpractice case does not begin until the patient receives a definitive diagnosis. Such an interpretation is contrary to the discovery rule of R.S. 9:5628 A; the meaning of constructive knowledge, as stated in Campo v. Correa, supra, Bailey v. Khoury, supra, and many cases; and this court’s jurisprudence directly rejecting the definitive diagnosis claim, Morgan v. Patwardhan, supra, and Bailey v. Haynes, supra. Constructive knowledge sufficient to start the running of prescription is information that excites attention and puts the injured party on guard and calls for inquiry. Hughes does not mandate reversal of this judgment. This assignment lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. All costs are to be paid by the plaintiff, Laurie Watson. ■
AFFIRMED.

. The Woman’s Clinic of Monroe, Dr. Sheppard and Nurse Peveto joined in one exception.

. Martin J. McMahon, Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance, 81 A.L.R.4th 487 (1985).

. Ms. Watson reiterates that until June 14, her damages were "merely speculative,” that the delay in diagnosis diminished her chances of survival, and that this is a separate, independent cause of action, citing Smith v. State, supra, and Claudet v. Weyrich, 94-2347 (La.App. 4 Cir. 9/28/95), 662 So.2d 131. For the reasons already discussed, we hold that a lost chance of survival is not an independent cause of action in a medical malpractice claim.