PITMAN, J.
| iDefendants, Christus Schumpert Health System (“Schumpert”) and the *267 Louisiana Patient Compensation Fund (“LPCF”), appeal a judgment rendered in favor of Plaintiff, Calvin Richardson, Jr. (“Calvin”), by the First Judicial District Court, Caddo Parish, Louisiana, in this medical malpractice action. A verdict was entered in favor of Calvin and against Schumpert in the amount of $110,000, which included $80,000 for past medical expenses. Calvin filed a motion for a judgment notwithstanding the verdict (“JNOV”), which was granted by the trial court. Judgment was entered, increasing the past medical damages to $190,000. The LPCF has intervened and also appeals the judgment rendered against it in the amounts in excess of $100,000, plus interest. For the following reasons, we affirm the original judgment and the judgment rendered pursuant to the JNOV.

FACTS

Calvin was 16 years old in 2006. He had . a history of severe asthma with frequent exacerbations or flare-ups and was diagnosed as a “brittle asthmatic.” On November 16, 2006, his mother took him to the office of his pediatrician, Dr. Brondwyn Holliway, who gave Calvin a shot of Celestone and administered four breathing treatments of Albuterol. When Calvin did not respond well to treatment, Dr. Holliway determined that he should be admitted to the pediatric floor of Schum-pert where a continuous treatment of Al-buterol could be administered to stop the cascade of inflammation and exacerbation of the asthma attack. This method of treatment had been successful before. In fact, Calvin had been treated for his asthma at Schumpert a short time before this November 2006 incident. Calvin 12received another nebulizer Albuterol treatment in the emergency department (“ER”) of Schumpert, and, at approximately 3:09 p.m., was sent to the pediatric intensive care unit (“PICU”) as an overflow patient. The nurses’ chart indicates that, at 4:15 p.m., the Respiratory Therapy Department was notified that a continuous Albuterol treatment had been ordered for Calvin.
Calvin did not begin to receive the continuous Albuterol treatment until 5:50 p.m. He received other ordered medications at 6:00 p.m. At that time, his continuous Albuterol treatment was halted while he was moved to the 8th floor of the main hospital. He was reconnected to his Albu-terol treatment at 7:00 p.m. The level of his medication was changed by doctor’s orders at approximately 7:35 p.m.; and, at 7:40 p.m., he suffered a respiratory arrest, had to be resuscitated and intubated and ultimately spent approximately two weeks in the hospital.
On November 2, 2007, Calvin’s parents, Gwen and Calvin Richardson, Sr., filed a Medical Review Panel proceeding against Schumpert and asserted a claim on behalf of their son, as well as individual claims for their respective damages. The Medical Review Panel’s found in favor of Schum-pert on August 4, 2010. The Richardsons had until November 29, 2010, to file suit.
On October 26, 2010, Calvin, who had reached the age of majority, filed suit on his own behalf. Calvin’s parents were not named as plaintiffs in the original suit. An amended petition filed on February 7, 2011, sought to add them as plaintiffs. Schumpert filed an exception of prescription,_[owhich was sustained by the trial court. The Richardsons’ claims were subsequently dismissed with prejudice.
Calvin’s suit alleged that his respiratory arrest, ischemia and subsequent damages were caused by a breach of the standard of care at Schumpert in that he did not receive his continuous Albuterol treatment in a timely fashion. Calvin claimed that the respiratory arrest caused him to graduate three months later than his high school *268 class and that he suffered personality changes, including a loss of drive. He also claimed he had pain in one of his feet and experienced some temporary visual problems, which resolved while he was in the hospital.
The central issues at trial were (1) whether the staff at Schumpert breached the standard of care by failing to administer Calvin’s medication in a timely manner, (2) whether the staff breached the standard of care in transferring him to another portion of the hospital and (8) whether Schumpert’s negligence caused the damages alleged by Calvin. After trial, a jury ruled in Calvin’s favor finding that Schum-pert had breached the standard of care and that the breach was a substantial factor contributing to his injuries. The judgment included damages of $80,000 for past medical expenses, $25,000 for past pain and suffering and $5,000 for loss of enjoyment of life. Calvin filed a motion for JNOV and sought an increase in the medical damages to $190,000. The trial court granted Calvin’s JNOV and increased the award for medical damages to $190,000 as requested. This appeal ensued.

\ .DISCUSSION

Standard of Care and Causation

Defendants have raised two related assignments of error and argue that the jury erred in finding that Schumpert breached the standard of care and that its alleged negligence was a substantial factor in causing Calvin’s injuries. Specifically, Defendants maintain that there is no reasonable factual basis in the record for the jury to conclude that the nursing staff breached the standard of care by failing to ensure that Calvin received his breathing treatments in a timely fashion or in transferring him to the main hospital after halting his continuous Albuterol treatment. Defendants also argue that Calvin failed to establish a causal nexus by expert testimony that any alleged act or omission on the part of Schumpert caused Calvin’s respiratory arrest. We disagree.
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that: the defendant owed the plaintiff a duty to protect against the risk involved; the defendant breached that duty; the plaintiff suffered an injury; and the defendant’s actions were a substantial cause-in-fact of the injury. Gordon v. Willis Knighton Med. Ctr., 27,044 (La.App.2d Cir.6/21/95), 661 So.2d 991, writs denied, 1995-2776, 1995-2788 (La.1/26/96), 666 So.2d 679. A hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. Id.; Hastings v. Baton Rouge Gen’l. Hosp., 498 So.2d 713 (La.1986). A determination of whether a hospital has breached those duties ^depends upon the facts and circumstances of each particular case. Id.; Hunt v. Bogalusa Community Med. Ctr., 303 So.2d 745 (La.1974).
Where there are contradictory expert opinions regarding compliance with the applicable standard of care in a medical malpractice case, the appellate court is bound to give great deference to the conclusions of the trier of fact. Hays v. Christus Schumpert Northern La., 46,408 (La.App.2d Cir.9/21/11), 72 So.3d 955. Hospitals are held to a national standard of care. The locality rule does not apply to hospitals. Henderson v. Homer Memorial Hosp., 40,585 (La.App.2d Cir.1/27/06), 920 So.2d 988, writ denied, 06-0491 (La.5/05/06), 927 So.2d 316. The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Galloway v. Baton Rouge Gen’l. Hosp., *269 602 So.2d 1003 (La.1992). Nurses who perform medical services are subject to the same standards of care and liability as are physicians. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his or her best judgment, in the application of his or her skill to the case. Little v. Pou, 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666, writ denied, 08-0806 (La.6/06/08), 983 So.2d 920.
A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). Thus, to reverse a trial court, the appellate court must find from the record that a reasonable factual basis |fidoes not exist for the finding and, further, that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra, at 844. However, where documents or objective evidence so contradict the witness’s testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the testimony, the appellate court may find manifest error even where the finding is purportedly based on a credibility determination. Id. at 844-45. Where this situation does not exist, however, and a fact finder’s determination is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. at 845; Welch v. Willis-Knighton Pierremont, 45,554 (La.App.2d Cir.11/17/10), 56 So.3d 242, units denied, 11-0075, 11-0109 (La.2/25/11), 58 So.3d 457, 459.
Calvin went to the Schumpert ER and was admitted there at 2:43 p.m. Dr. Hour-way’s orders were to admit him to the pediatric floor. Dr. Holliway also ordered a continuous Albuterol treatment and the administration of Decadron, IV Solu-Me-drol, Rondec, Zyrtec, Singulair, Biaxin and monitoring of routine vital signs. On the pediatric floor, routine vital signs are taken every four hours. None of Dr. Holli-way’s orders indicated that the medication was to be administered in an urgent manner. When Calvin’s vital signs were initially taken in the ER at 2:44 p.m., his 1 ^respiration rate was at 23 breaths per minute and his oxygen level was at 95%. He was given a nebulizer Albuterol treatment in the ER.
Although there is a discrepancy in the medical records as to the exact time of discharge from the emergency room, Calvin was discharged either at 3:09 or 3:26 p.m. He was transferred to the PICU on the fourth floor as an overflow pediatric patient because there were not enough beds available on the pediatric floor. The level of care provided to Calvin that day in the PICU was deemed intermediate care since he had not been admitted as a child in need of critical care.
Nurses Betsy Harris and Kelly Anderson were in charge of Calvin’s care on the fourth floor. Nurse Harris testified that she saw Dr. Holliway’s orders at 3:30 p.m., but her case notes state that she did not see the patient until 6:00 p.m. She claimed she never saw Calvin’s ER records, and she was unaware of his earlier vital signs and lower respiratory rate or that he had a breathing treatment in the ER. At 4:15 p.m., Nurse Anderson took Calvin’s vital signs, and his respiration had increased from 23 breaths per minute to 32 breaths per minute. The record reflects *270 that the normal respiratory rate for an adolescent is “18 to 20’s.” His oxygen level was 96%.
Calvin’s father, Calvin Richardson, Sr. (“Richardson”), arrived at Schumpert around 3:45 p.m., and his mother left to go to work. Richardson testified that he was with his son while he was in the PICU and that his son was becoming anxious because his breathing treatments had not yet been started. According to Richardson, he found a nurse and asked about |sCalvin’s medication(s) and the nurse advised that she would contact a respiratory therapist. After a 20-minute wait, Richardson again found the nurse, and she told him she had not forgotten about his concerns. Calvin continued to worsen and to sweat profusely, so Richardson informed two nurses at the nurses’ station that his son was getting worse. The nurses told him they had contacted the respiratory therapy department. They further informed him that nurses could not give the breathing treatment and that he would have to wait on the respiratory therapist.
At 5:30 p.m., Nurse Anderson called Dr. Holliway’s office to discuss the hospital’s need to move Calvin from the PICU to the eighth floor of the main hospital, which was an adult respiratory unit. The hospital needed the beds in the PICU for critically ill children. Nurse Harris testified that, Nurse Anderson told her she spoke to Dr. Holliway’s nurse, Olivia, who spoke to Dr. Holliway standing beside her. Olivia allegedly told Nurse Anderson that Dr. Holliway approved the transfer. Dr. Hol-liway’s testimony, however, differed in that she stated that she was not notified of the transfer of her patient until after it had already been accomplished and that no one had called her to ask her permission to transfer him.
Although the exact time is not clear from the medical record, around 5:50 p.m., approximately 2½ to 3 hours after Calvin arrived at PICU, the respiratory therapist on the fourth floor, Jonathan Holt, connected him to the continuous Albuterol treatment ordered by Dr. Holliway. Mr. Holt testified that, although he was unable to give a specific time when he initiated the breathing treatment since he had not noted the time on the chart, he did set it |9up within 10-15 minutes after the nursing staff told him that it was necessary. The chart contains a notation by Nurse Anderson that she notified respiratory therapy of the need for treatment at 4:15 p.m., and Mr. Holt insisted that he would have begun the treatment by 4:30 p.m. He also stated that he would not have waited an hour and 45 minutes to begin the treatment once he had the orders. Richardson, however, testified that the breathing treatment was begun only 10 minutes before the staff arrived at 6:00 p.m. to move Calvin to the eighth floor. Richardson testified that, by that time, his son “was doing real, real bad. I mean, he was having real difficulty breathing.”
Approximately 10 minutes later, at 6:00 p.m., Calvin received the IV Solu-Medrol, Rondec, Singulair and Biaxin, all of which were administered by the nursing staff. At that time, Nurse Harris informed Calvin and Richardson that Calvin was being transferred to the eighth floor of the main hospital because of the need for beds on the fourth floor and the fact that he was one of the oldest of the pediatric patients.
Nurse Harris stopped Calvin’s continuous Albuterol treatment in order to transfer him. She did not take any new vital sign readings, with the exception of noting that his oxygen level was at 100%. She further noted that Calvin was alert, but had labored breathing, was short of breath, had audible wheezing, was sweating and had a difficult time getting into the wheelchair being used to transport him. *271 Richardson estimated that it took Calvin approximately 15 minutes to move from the bed to the wheelchair. Nevertheless, the nursing staff deemed him stable enough to transfer to the |10eighth floor. Calvin’s canister of Albuterol was placed on his lap in the wheelchair as he was taken to the eighth floor of the main hospital. Nurse Harris testified that the transfer took only a very short period of time.
At 6:30 p.m., after first being taken to a room on the eighth floor which was not set up to provide oxygen and was not next to the nurses’ station, Calvin was placed in the proper room that had been prepared for him by his nurse on that floor, Elisa Metsger. Although there was no time noted on the chart, Nurse Metsger testified that Calvin’s vital signs were taken by a technical assistant upon his admission to the floor. There is a set of unidentified vital signs in Calvin’s records which indicate that his respiratory rate was 28 breaths per minute, his heart rate was 137 and his oxygen level was 97%. Nurse Metsger’s notes also indicate that Calvin’s condition remained unchanged from that noted by Nurse Harris, but added that he was unsteady and increasingly restless. Her notes further reflect that Calvin was reconnected to the continuous Albuterol treatments at 7:00 p.m., one hour after they were discontinued on the fourth floor.
At 7:10 p.m., Lisa Myers, a respiratory therapist, was called to assist the eighth floor respiratory therapist on Calvin’s case. The case notes indicate at that time that his respiratory rate was 24 breaths per minute and his heart rate was 155. Ms. Myers noted that his oxygen level was 96% and that his lungs seemed “tight,” indicating that he was unable to exhale. Calvin complained about shortness of breath and was irritable. Ms. Myers told Richardson that she would have Dr. Holli-way called.
InAt 7:25 p.m., at Ms. Myers’ request, Nurse Metsger called Dr. Holliway, at which time Dr. Holliway ordered an increase in the Albuterol from 8 to 10 milligrams per hour. At 7:35 p.m., Dr. Hol-liway’s new orders were faxed to the hospital pharmacy. Ms. Myers obtained the new medication and mixed it, brought it to Calvin’s room and made sure the treatment was being properly administered before she left the room.
At 7:40 p.m., a Code Blue was called. Calvin had gone into respiratory arrest, not because of lack of oxygen, but because he was unable to expel the carbon dioxide from his lungs. An ER physician came immediately to Calvin’s room and intubat-ed him. He was placed on a ventilator and then put into an induced coma so that he would not fight the ventilator. He was immediately moved back to the PICU where he remained on the ventilator for six days.
On November 19, 2006, Calvin was evaluated by a pediatric cardiologist, Dr. Robert Jackson. Dr. Jackson determined from Calvin’s elevated troponin level that, at the time of the respiratory arrest, he had suffered ischemia or temporary damage to his heart. The results of an electrocardiogram performed at that time, however, were normal. On November 26, 2006, Calvin was transferred from PICU to the pediatric floor until his discharge on December 1, 2006.
Calvin claims the standard of care by which the nurses of Schumpert must be judged is primarily that which is written in the hospital’s “Policies and Procedures.” In support of his claim that the staff at Schumpert had breached the standard of care, Calvin presented Patsy McCann, RN, a | steadier of Allied Health Care and Medical Law and Ethics, and a former employee at Schumpert. She was accepted as an expert in nursing and testified *272 that she had reviewed Calvin’s medical records and the hospital’s policies and procedures and determined that the staff had indeed breached the standard of care. The specific policies of the hospital which she considered included the following:
PC 3.269(1) Patients are transferred with appropriate hemodynamic monitoring and stabilizing support measures maintained throughout transports.
PC3.269(II)D Prior to transfer of patient, verify that room is ready.
PC3.269(II)F. Use the most suitable method of moving the patient with appropriate equipment.
PC3.266(II)B3b4 Initial assessment and admission history initiated within 1 hour and completed within 8 hours.
After reviewing these policies, Nurse McCann determined that Schumpert’s staff had failed to meet the standard of care in several ways. She stated that she had examined the chart and found that the nurses on the fourth floor did not initially assess Calvin, and, in fact, that he was not assessed until an hour after admission to the PICU. She also testified that an hour after an initial assessment is a reasonable time to initiate medications which are deemed to be administered “as quickly as possible.” Calvin’s medications were not initiated for more than an hour after they were noted at 3:30 p.m., vital signs were not recorded until 4:15 p.m. and none of the IV medications were given until 6:00 p.m. Nurse McCann further testified that those times were not within a reasonable time period to begin treatment and fell below the standard of care.
[1sIn addition, Nurse McCann testified that, in her opinion, the Schumpert staff failed to properly transport Calvin from the fourth floor PICU to the eighth floor because they transferred him after his oxygen and Albuterol/Decadron respiratory therapy had been discontinued. She also testified that it was a breach of the standard of care to move him from the PICU to the eighth floor without first receiving an order from the treating physician; and, in this case, there was no such order from Dr. Holliway. Nurse McCann further stated that Calvin’s transfer was not properly accomplished because, even though he was eventually taken to the room prepared for him by Nurse Metsger, he was originally taken to a room on the eighth floor which was not properly prepared to dispense the oxygen and Albuterol he required. She went on to testify that it was also a breach of the standard of care for Calvin to be transferred without his respiratory therapy equipment and to be without his respiratory treatment during the time it took to transfer him to the eighth floor.
Nurse Chinta Wilson was the director of the pediatric floor at Schumpert on the day Calvin was transferred from the fourth to the eighth floor. She testified that the standard of care for nurses required that a patient be stable before being transferred to another floor.
Schumpert and the LPCF argue that the medical evidence presented at trial shows the jury was clearly wrong in finding that the staff breached the applicable standard of care and that the breach caused Calvin’s damages. They claim that the evidence presented at trial does not support the jury’s findings because the physicians who testified at trial never testified that 114Schumpert’s actions caused Calvin’s injuries. We disagree and find that the record and evidence support the jury’s findings. Calvin was sent to Schum-pert specifically because the hospital setting provided the equipment necessary for him to receive a continuous Albuterol treatment to stop the exacerbation of his asthma attack after treatment at his physician’s office had not been successful. He *273 came to the ER with his mother at 2:43 p.m. and transferred to the PICU at either 3:09 p.m. or 3:26 p.m. According to the medical records introduced at trial, the respiratory therapist was notified at 4:15 p.m. that the continuous Albuterol treatment had been ordered. Calvin’s father testified that he informed the nurses on the fourth floor several times that his son was getting anxious and requesting his breathing treatment, but it was not until 5:50 p.m. that the treatment was actually started. Within 10 minutes of the initiation of the continuous Albuterol treatment, the nursing staff disconnected the medication and transferred Calvin to the eighth floor. There is no indication in the medical charts that the medication was reconnected until 7:00 p.m. The respiratory therapist who agreed to assist the therapist on the eighth floor noted that Calvin’s lungs were tight and that he was agitated. Within the hour, the Code Blue was called.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. The jury chose to believe Calvin’s evidence presented at trial. We note that the record reflects that Calvin arrived at the hospital for treatment to halt his cascading asthma attack, but that he did not begin to receive the 11fiordered continuous Albuterol treatments until at least 2½ to 3 hours after his arrival at the PICU. The testimony of all the doctors at trial indicated that an asthma exacerbation is an emergency and treatment should be started as quickly as possible in order to break the inflammatory cascade and ease the airway narrowing. All of the medications ordered by Dr. Hol-liway were designed to stop the cascade and any associated risk. We agree with the jury’s conclusion that the tardy administration of the medication was a breach of the standard of care and that the breach caused Calvin’s eventual respiratory failure. The jury’s findings were not manifestly wrong. Accordingly, these assignments of error are without merit.

JNOV

In an additional assignment of error, Defendants contend that the trial court erred in granting Calvin’s motion for JNOV because a reasonable jury could have concluded that the original award of $80,000 for past medical damages was appropriate. Specifically, Schumpert and the LPCF contend that the trial court erred in assuming that the jury’s award was based on the misapplication of the collateral source rule to the award of damages and increasing the award of damages to $190,000, the amount requested in open court by Calvin’s attorney. Defendants claim that a reasonable jury could have concluded that Calvin’s medical damages were only $80,000 because he failed to explain in court exactly which portions of the medical damages were attributable to the breach of the standard of care. For these reasons, Defendants claim the trial court should not have substituted its own view for that of the jury with regard to medical damages. We disagree.
|UA JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach a different conclusion, not merely when there is a preponderance of the evidence for the mover. Peterson v. Gibraltar Savings & Loan, 98-1601 (La.5/18/99), 733 So.2d *274 1198; Welch v. Willis-Knighton Pierremont, supra.
Under the “collateral source rule,” a tortfeasor may not benefit because of his victim’s receipt of insurance payments from sources independent of the wrongdoer’s contribution. A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of injury. Terrell v. Nanda, 33,-242 (La.App.2d Cir.5/10/00), 759 So.2d 1026.
Special damages are those damages that can be determined with some degree of certainty and include past and future medical expenses. Thibeaux v. Trotter, 04-482 (La.App.3d Cir.9/29/04), 883 So.2d 1128, writ denied, 04-2692 (La.2/18/05), 896 So.2d 31. “Medical expenses are a component of special damages.” Cormier v. Colston, 05-507 (La.App.3d Cir.12/30/05), 918 So.2d 541. The plaintiff bears the burden of proving special damages by a preponderance of the evidence. Id. An award of special damages is reviewed pursuant to the manifest error standard of review. Id. 117at 547-48; Collins v. National Healthcare of Leesville, Inc., 12-502, (La.App.3d Cir.11/07/12), 101 So.3d 1110.
During its deliberations, the jury sent a question to the trial judge to determine the out-of-pocket expenses of Calvin’s family. The judge sent an instruction to the jury regarding the collateral source rule and notified it that the hospital bill showed a payment by the HMO/PPO of $118,000.
At the hearing on the motion for the JNOV, the trial judge stated:
It seems clear that what the Jury did was they subtracted the one-eighteen from the one-nighty-eight, and that is where the $80,000.00 came from. So they did not give the Plaintiff the benefit of the collateral source rule.
I mean, it looks like that they were of the view that the Plaintiffs would have only been responsible for the $80,000.00 that was not covered by the HMO/PPO payment.
[[Image here]]
So I do not think that the Jury understood what the collateral source rule is, and the damage award for the past medicals is just clearly wrong.
Based on this reasoning, the trial judge found the jury’s award to be abusively low and granted the JNOV, increasing the medical award to $190,000, which was Calvin’s estimate of the medical damages after a deduction of $8,000 (an approximate charge for a two-day stay at the hospital which would have been incurred had Defendant’s actions not caused the need for an extended stay).
The trial court’s actions in granting the motion for JNOV and increasing the amount for medical damages was not in error. Calvin introduced evidence at trial that his total charges for his care at Schumpert from November 16, 2006, through December 1, 2006, were $198,485. | ¡^Defendants made no objection to the bill and introduced no evidence to prove that this bill did not properly measure Calvin’s actual medical damages. The past medical damages sought are specific damages and need no interpretation. The jury clearly did not understand the collateral source rule, and the trial court simply corrected the misunderstanding by increasing the award of damages to an amount reflecting the proper past medical damages actually due Calvin. For that reason, we find no error in the trial court’s decision to grant the JNOV and raise the award for medical damages to $190,000. Defendants’ final assignment of error is without merit.

*275
CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court in favor of Calvin Richardson, Jr. and against Chris-tus Schumpert Health System and the Louisiana Patient’s Compensation Fund. We further affirm the judgment of the trial court granting the judgment notwithstanding the verdict and amending the judgment to increase the award for past medical expenses to $190,000. Costs of this appeal are assessed to Defendants, Christus Schumpert Health System and the Louisiana Patient’s Compensation Fund.
AFFIRMED.