Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,056-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

REGINALD LEWIS, ON BEHALF                   Plaintiff-Appellant
OF ROBERT LEWIS, JR.

versus

CORNERSTONE HOSPITAL OF                     Defendant-Appellee
BOSSIER CITY, LLC

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 151,867

Honorable E. Charles Jacobs, Judge

* * * * *

THOMAS, SOILEAU, JACKSON,                   Counsel for Appellant
BAKER & COLE, LLP
By: Steven E. Soileau

HUDSON, POTTS, & BERNSTEIN                   Counsel for Appellee
By: Gordon L. James
    Sara G. White

* * * * *

Before MOORE, PITMAN, and GARRETT, JJ.

**MOORE, J.**

Reginald Lewis appeals a jury verdict that denied his claims for medical malpractice and invasion of privacy involving his late father, Robert Lewis ("Mr. Lewis"), as well as a judgment that denied his motion for JNOV. The case involves treatment that Mr. Lewis received at Cornerstone Hospital, a long-term acute care facility, from April 17 to April 30, 2015. For the reasons expressed, we affirm.

## FACTUAL BACKGROUND

The 63-year-old Mr. Lewis, a Vietnam veteran and longtime smoker, went to the emergency room at the VA hospital in Shreveport with complaints of speech changes, fatigue, decreased oral intake, and weight loss. Dr. Sean Troxclair, an internist, critical care and nutrition physician, admitted him and became his treating physician. Mr. Lewis weighed only 88 pounds, was about half the normal body mass index, and needed aggressive nutritional support. A CT scan showed a large malignant mass in his throat; it was cancer. He underwent surgery to remove the mass. Doctors also inserted a feeding tube (called a "PEG") into his abdomen to provide nutritional access and a tracheostomy ("trach") into his throat to secure his airway. While at the VA, he developed a large (3 cm × 3 cm) decubitus ulcer, Stage III, in the sacral area. The oncologist at the VA said Mr. Lewis needed chemotherapy, but could not undergo it because he was so underweight.

Dr. Troxclair transferred Mr. Lewis to Cornerstone on April 17 so he could gain weight and strength, with the plan of beginning chemo and radiation to treat the cancer. Despite his health problems, doctors at the VA

described Mr. Lewis as in "good condition"; Dr. Troxclair said he was talking, using a walker, oriented, and having no problem with the PEG or trach. Dr. Troxclair sent dietary instructions to Cornerstone: give Mr. Lewis Impact 1.5 at 60 ml/hour, and feed him like a 70 kg (154-lb.) man instead of the 40-45 kg (88-99-lb.) man he was.

Mr. Lewis arrived at Cornerstone on April 17 and was admitted to the ICU by Dr. Allan Matriano-Lim, an internist and pediatrician with privileges there. Oddly, neither Dr. Matriano-Lim nor Cornerstone's clinical dietician, Valerie Calhoun, could recall ever seeing Dr. Troxclair's dietary instructions. However, Ms. Calhoun recalled seeing *some orders* from the VA, and Dr. Matriano-Lim gave orders to feed Mr. Lewis Vital 1.5 at 60 ml/hour. (Ms. Calhoun testified that Cornerstone did not stock Impact 1.5, so they used Vital 1.5 instead.) After two days in ICU, Mr. Lewis was moved to the "floor."

At this point, unfortunately, Mr. Lewis's condition started to go downhill. On April 19, he refused his PEG feeding, demanded solid food, and complained to Ms. Calhoun about cramps and nausea. Thinking he could not tolerate the high volume and protein of Vital 1.5, Ms. Calhoun switched him to a formula called Peptamen 1.5 at 50 ml/hour, and he seemed to respond better. However, on April 22, Dr. Matriano-Lim issued a new order to use Impact 1.5, which they had ordered but not yet received, so they resumed using Vital 1.5. On April 23, Mr. Lewis vomited it up, and on April 24, he refused any more tube feeding. On April 25, an attending physician, Dr. Jackson, found abdominal distension and ordered tube-feeding stopped; he placed Mr. Lewis on an intravenous ("IV") feed of ProcalAmine at 77 ml/hour. Mr. Lewis also pulled out his trach at least

2

three times, and nurses simply replaced it, without notifying Dr. Matriano-Lim. On April 27, nurses charted "dark liquid input" into Mr. Lewis's genitourinary bag, but did not chart that they notified the doctor of this, either.

On April 28, at 3:00 am, nurses discovered that Mr. Lewis had pulled out his PEG tube (which must have involved some effort and some pain). Nurses removed the broken sutures, and cleaned and dressed the site; at 8:00 am, they called Dr. Matriano-Lim about this. At 8:15, he ordered them to place a catheter in the PEG site and consult with a general surgeon, but he did not label this STAT or urgent. No surgeon ever came, but nurses inserted the catheter by 8:35. Cornerstone's chief of nursing, Tamara Grimm, felt this was acceptable since Mr. Lewis was getting IV nutrition by then.

Cornerstone's case manager, Connie Combs, testified that she became "very concerned" about Mr. Lewis's changes at this point. She faxed a clinical update to the VA (but not directly to Dr. Troxclair), advising that the PEG feeding had been "on hold" since April 25 because of abdominal distension, but that Mr. Lewis was on IV ProcalAmine; he had a wound on his backside; and he had walked 265 feet with a rolling walker. The next day, April 29, she phoned her contact at the VA, a Ms. Sanders, to make sure they got the message. On April 30, Dr. Troxclair finally received this information and ordered Mr. Lewis transferred back to the VA.

On his return to the VA, Mr. Lewis was not in good shape. He was still emaciated, was noncommunicative, had irritation around his trach and PEG sites, and still had the decubitus ulcer. Because of his malnutrition and distended abdomen, he was not a candidate for surgery or chemo. After

3

consultation with Reginald, Mr. Lewis's son, Dr. Troxclair placed him on palliative care, and he died on May 19.

During this ordeal, Reginald had been driving down from his home in Topeka, Kansas, every week or two to see his father. He admitted the prognosis was bad, but his dad was "a little better" by the time he was sent to Cornerstone. In one visit, early during Mr. Lewis's stay there, he "seemed okay," and even wanted to leave and go with the family to Walmart. Reginald was alarmed when he heard how bad his dad's situation was on his return to the VA. At some point, Reginald called Dr. Troxclair, who apparently vented some frustration at Cornerstone, blaming it for allowing the patient to lose weight and get an ulcer on his backside. According to Reginald, Dr. Troxclair told him, "We had him up, almost jogging, ready to go to the store," but once at Cornerstone, "he turned so fast." Reginald then called Ms. Combs, the case manager at Cornerstone, to complain, particularly about the ulcer Mr. Lewis got while there.

On May 20, two Cornerstone employees, William Candler, director of provider relations, and Lindsey Trainor, clinical liaison, went to the VA to talk to Dr. Troxclair; according to Candler, he "had questions" and they "did not have the answers." They checked their records and, on May 27, went back to the VA to advise Dr. Troxclair that Mr. Lewis already had that ulcer when he left the VA (in fact, by their records, it had shrunk slightly while he was at Cornerstone). They also wanted to repair their damaged business relationship with the VA. They testified they did not think they needed the patient's consent to hold this meeting, but Cornerstone later produced a Health Insurance Portability and Accountability Act ("HIPAA")

4

authorization bearing Mr. Lewis's name and marked "VC" for voice consent.

## PROCEDURAL HISTORY

Reginald filed a request for Medical Review Panel ("MRP"), but the panel unanimously found that the evidence did not support the conclusion that Cornerstone or its nurses failed to meet the applicable standard of care. The MRP rejected claims that Cornerstone failed to properly maintain and monitor the PEG and trach sites; allowed a large decubitus ulcer to develop; and failed to monitor, detect and address the patient's declining condition.

Reginald filed this suit, in December 2016, for wrongful death and survival damages, against Cornerstone; he named no individual doctors or nurses as defendants. He alleged, in essence, that Cornerstone's conduct deprived Mr. Lewis of a chance of recovery, and he demanded a jury trial. By amended petition, in August 2017, he further alleged that Cornerstone's employees, Candler and Trainor, breached Mr. Lewis's confidentiality, statutory privilege, privacy, and implied contract by going to the VA and discussing his case with Dr. Troxclair, without his (Mr. Lewis's) consent.

The case went to a 12-member jury over four days in July 2018. The witnesses testified as outlined above. For the plaintiff, Dr. Troxclair, who was by then no longer at the VA but a contracting physician at CHRISTUS Schumpert in Coushatta, La., testified that it was a breach of standard for Cornerstone not to follow his dietary instructions to the letter, as Mr. Lewis got less than half the protein he needed; this was why his condition declined. The plaintiff also called Peggy Richardson, RN, as an expert in nursing. She felt Cornerstone's nurses breached the standard of care by not calling a surgeon to replace Mr. Lewis's pulled-out PEG tube as soon as they

5

discovered it; by not notifying a doctor every time he pulled out his trach; by generally failing to document the patient's condition; by failing to provide adequate nutritional support; and by failing to assess, document, report, and treat the decubitus ulcer. Dr. Matriano-Lim, on cross-examination, testified that he did not recall ever seeing Dr. Troxclair's dietary instructions for Mr. Lewis; he felt that if the patient pulled out his trach, and the nurses could get it back in place, there was no need to call him; yet he agreed that nurses should have called him when Mr. Lewis pulled out his PEG.

Cornerstone called the three members of the MRP. Dr. Jon D. LeLeux, a cardiologist in Lafayette, La., testified that the ulcer did not develop while Mr. Lewis was at Cornerstone, and it did not get worse there; it is not malpractice if the patient pulls out his trach and PEG; the formula Mr. Lewis received at Cornerstone was identical to that ordered by Dr. Troxclair, just a different brand made by a different manufacturer; most doctors rely on dieticians for dietary instructions; it was not malpractice if the patient could not tolerate the prescribed formula; and Mr. Lewis did not lose weight while at Cornerstone. Dr. Kyla Lokitz, a rheumatologist in Shreveport (and also Dr. LeLeux's sister), testified that Mr. Lewis came to Cornerstone with advanced disease and a high probability of mortality; she agreed with the MRP's finding of no breach, but admitted that failure to follow Dr. Troxclair's dietary instructions was outside her field of expertise. Dr. Brian Dockendorf, a general surgeon in Shreveport, testified that Vital 1.5, the formula given by Dr. Matriano-Lim, was "comparable" to Impact 1.5, the formula prescribed by Dr. Troxclair; if the patient could not tolerate the prescribed formula, it was appropriate to reduce the intake; because of Mr. Lewis's ongoing problems, it was appropriate for Dr. Jackson to place

6

him on IV feeding; when Mr. Lewis pulled out his PEG, it was within the standard of care for the nurses to put in a catheter and not call the doctor immediately; Cornerstone's staff met the standard of care as to his nutrition; and the ulcer did not get worse while Mr. Lewis was at Cornerstone. On direct examination, Dr. Matriano-Lim testified that Cornerstone's nurses and dieticians followed all his instructions; owing to Mr. Lewis's complaints, he changed the formula and increased the volume, but Mr. Lewis still could not take the PEG feeding, so they had to stop it; if a patient removes his PEG or IV, nurses need to "fix it," and need not necessarily call the doctor; and Mr. Lewis did not lose any weight while at Cornerstone.

## ACTION OF THE TRIAL COURT

The jury found, 10-2, that Cornerstone did not breach the standard of care as to Mr. Lewis's treatment. It then found, 10-2, that Cornerstone made an unauthorized disclosure of Mr. Lewis's medical information, in violation of HIPAA, and resulting in an invasion of privacy. However, it further found, 10-2, that Reginald sustained no damages from the invasion of Mr. Lewis's privacy. The court rendered judgment rejecting all claims.

Reginald then filed a motion for JNOV urging that it was "clearly erroneous" for the jury to find no breach of the standard of care and, despite finding an invasion of privacy, to award no damages. The court denied the motion.

Reginald has appealed, raising three assignments of error.

## DISCUSSION

### *Medical Malpractice – Loss of a Chance*

By his first assignment of error, Reginald urges the court erred in failing to find a breach of the standard of care. He shows that the plaintiff's

7

burden of proof in a medical malpractice case is that stated in La. R.S. 9:2794 and in *Samaha v. Rau*, 2007-1726 (La. 2/26/08), 977 So. 2d 880: the plaintiff must prove the standard of care, breach, and causal connection. Further, the burden of proof in a lost-chance-of-survival case is that stated in *Smith v. State*, 95-0038 (La. 6/25/96), 676 So. 2d 543, and *Benefield v. Sibley*, 43,317 (La. App. 2 Cir. 7/9/08), 988 So. 2d 279, *writs denied*, 2008-2162, -2247 (La. 11/21/08), 996 So. 2d 1107, 1108: the plaintiff must prove that a chance of survival (even if under 50%) existed, and that it was lost through the defendant's negligence. He also contends that the testimony of a treating physician (here, Dr. Troxclair) is entitled to more weight than that of physicians called merely for consultation (here, the MRP members), *Schouest v. J. Ray McDermott & Co.*, 411 So. 2d 1042 (La. 1982); *Freeman v. Rew*, 557 So. 2d 748 (La. App. 2 Cir.), *writ denied*, 563 So. 2d 1154 (1990).

Reginald closely reiterates the facts, stressing (1) Drs. LeLeux and Lokitz both said a doctor must be notified when the patient pulls out a feeding tube, but the nurses at Cornerstone failed to do this; (2) Nurse Richardson, the plaintiff's expert, strongly found that Cornerstone's nurses failed to observe and report evidence of sepsis in Mr. Lewis; (3) only Dr. Dockendorf, an MRP member, disagreed with the plaintiff's witnesses, and he has the reputation of (by his own admission) finding in favor of plaintiffs only about 3% of the time; and (4) nobody could ever explain what happened to Dr. Troxclair's dietary instructions when they arrived at Cornerstone. Reginald submits that on this record, it was legal error for the jury to find no breach of duty, so de novo review is warranted. He further contends that the evidence shows that Mr. Lewis had a significant chance of

survival, which was lost through Cornerstone's negligence. He suggests general damages of $100,000 to $150,000 for Mr. Lewis's pain and suffering.[1]

The burden of proof in a medical malpractice action is stated in La. R.S. 9:2794 A:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., * * * the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians * * * licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; * * *
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

In a malpractice claim against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, the defendant breached that duty, the plaintiff suffered an injury, and the defendant's actions were a substantial cause in fact of the injury. *McGlothlin v. Christus St. Patrick Hosp.*, 2010-2775 (La. 7/1/11), 65 So. 3d 1218; *Little v. Pou*, 42,872 (La. App. 2 Cir. 1/30/08), *writ denied*, 2008-0806 (La. 6/6/08), 983 So. 2d 920. A hospital is liable for its employee's negligence, including its doctors and nurses, under the doctrine of *respondeat superior*. *Little v. Pou*, *supra*, and citations

---

[1] In support, he cites *Toston v. St. Francis Med. Ctr. Inc.*, 49,963 (La. App. 2 Cir. 10/14/15), 178 So. 3d 1084, *Coody v. Barraza*, 47,732 (La. App. 2 Cir. 3/6/13), 111 So. 3d 485, *Benefield v. Sibley*, *supra*, and *McCrery v. Willis Knighton Med. Ctr.*, 29,999 (La. App. 2 Cir. 12/10/97), 705 So. 2d 753.

9

therein. A hospital is bound to exercise the requisite standard of care toward a patient that the particular patient's condition may require and to protect the patient from external circumstances peculiarly within the hospital's control. *McGlothlin v. Christus St. Patrick Hosp.*, *supra*; *Richardson v. Christus Schumpert Health Sys.*, 47,776 (La. App. 2 Cir. 2/27/13), 110 So. 3d 264, *writ denied*, 2013-0621 (La. 4/19/13), 112 So. 3d 228. The mere fact that an injury occurred or an accident happened does not raise a presumption that the hospital was negligent. *Campo v. Correa*, 2001-2707 (La. 6/21/02), 828 So. 2d 502; *Richardson v. Christus Schumpert*, *supra*.

The loss of a chance of a better outcome is a theory of recovery recognized in Louisiana law. *Burchfield v. Wright*, 2017-1488 (La. 6/27/18), __ So. 3d __; *Watson v. Glenwood Reg'l Med. Ctr.*, 49,661 (La. App. 2 Cir. 4/15/15), 163 So. 3d 817, *writ denied*, 2015-0945 (La. 8/28/15), 176 So. 3d 404. It is not a separate cause of action from the medical malpractice claim. *Burchfield v. Wright*, *Watson v. Glenwood*, *supra*. Under this theory, the plaintiff may carry his burden of proof by showing that the defendant's negligence was a substantial factor in depriving the patient of some chance of life, recovery, or a better outcome. The negligence need not be the only causative factor, but it must have increased the harm to the patient. *Burchfield v. Wright*, *supra*; *Smith v. State*, *supra*.

Appellate review of the trial court's findings in a medical malpractice case is limited to manifest error. *Johnson v. Morehouse Gen'l Hosp.*, 2010-0387 (La. 5/10/11), 63 So. 3d 87; *Richardson v. Christus Schumpert*, *supra*. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Johnson v. Morehouse*, *supra*; *Richardson v. Christus Schumpert*, *supra*.

10

The rule that questions of credibility are for the trier of fact extends to the evaluation of expert testimony, unless the reasons stated by the expert are patently unsound. *Ryan v. Zurich Amer. Ins. Co.*, 2007-2312 (La. 7/1/08), 988 So. 2d 214; *Van Buren v. Minor*, 51,960 (La. App. 2 Cir. 4/11/18), 247 So. 3d 1949, *writ denied*, 2018-0768 (La. 9/21/18), 252 So. 3d 911.

We have closely examined the jury's finding that Cornerstone did not breach the applicable standard of care. At first blush, it does strike us as unusual that nobody at Cornerstone – notably Dr. Matriano-Lim or Ms. Calhoun – could recall seeing the specific dietary instructions that Dr. Troxclair sent with Mr. Lewis. To misplace the orders of the transferring doctor would seem to defeat the whole purpose of the transfer. However, Ms. Grimm, Cornerstone's chief clinical officer, testified that when they receive transfer records, they keep these in a manila envelope in the physicians' dictation area, for the convenience of their physicians, but they do not incorporate them as part of Cornerstone's permanent record, they cannot certify or reproduce them, and, after the patient is discharged, they destroy them. The plaintiff offered no evidence that this office procedure was a breach of the standard of care. In addition, Dr. Matriano-Lim testified that he had seen *some orders* (we assume these were Dr. Troxclair's), and in fact he prescribed Vital 1.5 at 60 ml/hour, a formula which, according to Drs. Dockendorf and LeLeux, was equivalent to the Impact 1.5 at 60 ml/hour prescribed by Dr. Troxclair. The plaintiff offered no evidence that these were not equivalent formulas or that giving Mr. Lewis an equivalent was a breach of the standard of care.

The record further shows that as soon as Mr. Lewis was moved to the floor, he began suffering cramps and nausea, leading Ms. Calhoun to change

11

his formula; later, when he was returned to the original formula, he immediately showed that he could not tolerate it, vomiting and complaining of nausea, leading Dr. Jackson to initiate IV feeding. While Dr. Troxclair was adamant that failure to follow his dietary orders was malpractice, he admitted that very underweight patients may "refuse the feed"; critically, he did not know "the kind of things * * * happening at Cornerstone in terms of how the patient was responding to the nutrition he was getting." Dr. Dockendorf testified that Cornerstone's response to the challenges of feeding Mr. Lewis was appropriate; Dr. LeLeux testified that the volume of PEG feeding depends on what the patient can tolerate. The jury could reasonably infer that Dr. Troxclair simply was unaware of the contingencies that kept arising with Mr. Lewis's case.

The record also shows that Dr. Troxclair was plainly wrong in his initial impression that Mr. Lewis developed a large decubitus ulcer *while at* Cornerstone. He conveyed this "fact" to Reginald as proof of Cornerstone's negligence. However, the VA's own records showed that Mr. Lewis had the ulcer before he left the VA, a point that escaped Dr. Troxclair's notice. On this evidence, the jury did not abuse its discretion in discounting his claims of malpractice, and in accepting the testimony of Drs. Dockendorf and Matriano-Lim, and of Ms. Calhoun, that Cornerstone did not breach the standard of care as to Mr. Lewis's nutrition.

As for Cornerstone's handling of Mr. Lewis's PEG and trach, Nurse Richardson was insistent that the nurses should have called the doctor each time he pulled these out, and Dr. Lokitz, one of the MRP members, agreed that when he pulled out his PEG, this probably worsened his condition. However, Dr. Matriano-Lim testified that when this happens, the nurses are

supposed to "fix it"; they did, so it was no breach if they did not promptly call a doctor; Dr. Dockendorf agreed that because the nurses inserted a catheter into PEG hole, the situation was not urgent. Nurse Richardson also faulted Cornerstone for failing to observe and report evidence of sepsis, but Dr. Dockendorf testified that from his review of the record, Mr. Lewis did not have sepsis. The record does not show that Drs. Matriano-Lim and Dockendorf's view was "patently unsound." *Ryan v. Zurich Amer.*, *supra*; *Van Buren v. Minor*, *supra*. In short, the record presents ample evidence to support the jury's decision to disregard Nurse Richardson's claims of nurse malpractice.

With these conclusions, we need only briefly address the claim for loss of a chance of survival. Reginald correctly shows that Mr. Lewis probably had a chance of survival when he came to Cornerstone: this was the view of Dr. Troxclair and Nurse Richardson, while Dr. Lokitz felt he had a "high probability of mortality," and the other experts were not asked to express an opinion.

As noted, the loss of a chance of a better outcome is a theory of recovery, not a separate cause of action from medical malpractice. *Burchfield v. Wright*, *supra*; *Watson v. Glenwood*, *supra*. The jurisprudence requires the defendant's "negligence" to be a substantial factor in harming the patient. In our view, this negligence requires proof of medical malpractice, as defined by La. R.S. 9:2794, *Little v. Pou*, *supra*, and *Pfiffner v. Correa*, *supra*. The mere fact that an injury occurred does not mean the physician was negligent. *Campo v. Correa*, *supra*; *Van Buren v. Minor*, *supra*. The jury was not plainly wrong to find that Cornerstone did not

13

breach the applicable standard of care with Mr. Lewis; thus, there is no basis for an award of damages for loss of a chance of survival.

This assignment of error lacks merit.

### *Invasion of Privacy – JNOV*

By his second assignment of error, Reginald urges the court erred in failing to award damages for invasion of privacy and unauthorized disclosure of medical records, after finding Cornerstone guilty of this. By his third assignment, he contends the court erred in denying his motion for JNOV on this issue. He shows that unauthorized disclosure of medical information by a medical provider to a third person gives rise to damages, *Williams v. Sistrunk*, 417 So. 2d 14 (La. App. 4 Cir. 1982); *Glenn v. Kerlin*, 248 So. 2d 834 (La. App. 2 Cir. 1971); *Doe v. Smith*, 2005-0653 (La. App. 4 Cir. 7/13/05), 913 So. 2d 140. He contends that once the jury found a breach, it was legal error to find no damages, thus activating the standard of JNOV, *Anderson v. New Orleans Public Serv. Inc.*, 583 So. 2d 829 (La. 1991). He submits that nominal damages, in the amount of $5,000, would be an appropriate award.[2]

At the outset, we note that the jury form referred to a "violation of HIPAA," as did much of the testimony at trial; however, HIPAA does not create a private right of action. *Acara v. Banks*, 470 F. 3d 569 (5 Cir. 2006); *Fox v. City of Alexandria*, 2007-810 (La. App. 3 Cir. 12/5/07), 971 So. 2d 468. We also note recent jurisprudence holding that claims of privacy are

---

[2] In support, he cites *Taylor v. Action Household Rentals Inc.*, 351 So. 2d 865 (La. App. 2 Cir. 1977), *McAndrews v. Roy*, 131 So. 2d 256 (La. App. 1 Cir. 1961), and *Jaubert v. Crowley Post Signal*, 368 So. 2d 475 (La. App. 3 Cir. 1979). We are constrained to observe, however, that *Jaubert* was *reversed on the merits*, with the Supreme Court finding no that invasion of privacy occurred, 375 So. 2d 1386, 5 Media L. Rep. 2084 (La. 1979).

personal to the individual, and not heritable. *Frigon v. Universal Pictures Inc.*, 2017-0993 (La. App. 1 Cir. 6/21/18), 255 So. 3d 591, 46 Media L. Rep. 1861, *writ denied*, 2018-1868 (La. 1/18/19), 262 So. 3d 896; *Tatum v. New Orleans Aviation Bd.*, 2011-1431 (La. App. 4 Cir. 4/11/12), 102 So. 3d 144, 40 Media L. Rep. 1649, *writ denied*, 2012-1847 (La. 11/9/12), 100 So. 3d 838. Although these concepts were not addressed at trial or in the appellate briefs, they illumine and support the jury's verdict.

Mr. Lewis left Cornerstone on April 30. At some point after that, Dr. Troxclair told Reginald that Mr. Lewis had developed an ulcer while there; Reginald phoned Cornerstone to complain about this. Mr. Lewis died on May 19. The next day, two of Cornerstone's employees, Candler and Trainor, went to the VA to address Dr. Troxclair's claims about their poor handling of Mr. Lewis. At the time, none of the persons involved – Candler, Trainor, or Dr. Troxclair – was aware that Mr. Lewis had passed away. One week later, Candler and Trainor returned to advise Dr. Troxclair that his facts were wrong, as Mr. Lewis had the ulcer before he ever got to Cornerstone. Candler and Trainor testified that both meetings were held in Dr. Troxclair's office, with the door closed, and not in a public area. This was not a "data dump" or a general broadcast of personal information about a patient. The jury was entitled to find a sharing of information between healthcare providers who, ultimately, would be entitled to the information. We perceive no error in the jury's finding of no damages.

A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be denied if there is evidence opposed to the motion which is of such quality

15

and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. *Trunk v. Medical Center of La. at New Orleans*, 2004-0181 (La. 10/19/04), 885 So. 2d 534; *Moore v. IASIS Glenwood Reg'l Med. Ctr.*, 51,177 (La. App. 2 Cir. 2/15/17), 216 So. 3d 187, *writ denied*, 2017-0465 (La. 5/1/17), 219 So. 3d 1101.

Even if the jury found that an invasion of privacy occurred, on this record, the evidence with respect to damages was such that reasonable and fair-minded people could reach different conclusions. As such, the district court did not err in denying the motion for JNOV.

These assignments lack merit.

## CONCLUSION

For the reasons expressed, the judgment on the verdict dismissing all claims, and the judgment denying the motion for JNOV, are affirmed. All costs are assessed to the plaintiff, Reginald Lewis.

**AFFIRMED.**

16